Peck, J.
The petition alleges that the bill of exchange in suit, was assigned to the plaintiff before it became due ; which allegation is not controverted by the defendants.
The defense stated in the first answer, is a want of authority on the part of the Bank of Kanawha, the real payee of said bill, to purchase or acquire it at the place and in ’the manner therein stated. It avers in substance, that the said bank, being a banking institution of the state of Virginia, acting by its cashier, was engaged, both before and after the purchase of said bill, in the business of banking, at Chillieothe, in the state of Ohio, by loaning money on the discount of bills of exchange and other commercial paper, and that being so engaged, it did, then and there, discount said bill, without any authority to do so under the laws of the state of Ohio. It is not averred in the answer that the Bank of Kanawha was not authorized by its charter to buy and sell bills of exchange, and such authority must, therefore, be presumed. Nor is there any averment that the plaintiff was aware, when the bill was assigned to him, that it had been discounted in this state, and this fact certainly does not appear on the face of the bill. This answer, therefore, suggests two questions : 1. Whether a banking institution, incorporated by the laws of one state, and empowered by its charter to buy and sell bills of exchange, can lawfully make such purchase within the limits of another state? 2. If such purchase is prohibited by statute or a principle of state policy, whether an assignee, before its maturity, of such bill and without notice of the illegality, can enforce its payment by a suit against the drawers of the bill ?
*502 Notwithstanding some early decisions to the contrary, it is now well settled, that a banking corporation created by the laws of one state, has capacity to make a contract falling within its corporate powers in any other state, unless its capacity to make such contract, is opposed to the laws or the •settled policy of the state in which its exercise is attempted. Such contracts are permitted upon principles of comity between the different states of this Union, and in furtherance of the intimate commercial relations existing between their respective citizens. Angelí & Ames on Corporations, sec. 273, and cases cited.
It is manifest that the purchase of the bill, under the circumstances stated in the first answer, was legal, valid and enforceable inter partes, unless it was forbidden by the statutes of the state, or is opposed to its settled policy. The counsel for defendants insist that it was so forbidden, and refer us to' the first section of the act of March 12, 1845 (1 S. & 0. Stat. 152) which reads as follows:
“ That no body politic or corporate shall establish a bank, or engage in the business of banking, to receive on deposit, keep and circulate the money or bank paper of others, without express authority of a law of this state.”
This section, as it reads, does not prohibit unauthorized banking, as such, but only a particular function or department of banking — the reception, custody and circulation of the money or bank paper of others — and the facts stated in the first answer, therefore, do not bring the case within the letter of this prohibition. But it' is urged, that the word “ to ” in the above section is evidently a misprint, and should be read, “ or receive,” etc., thus creating two prohibitions — one against unauthorized banking generally and the other against the exercise of a particular function or attribute of banking.
It is also insisted that the propriety of such substitution,is manifest from sections 2 and 11 of the same statute. But it is not very apparent from those sections that anything more than a partial prohibition was intended by the first. At •all events, there was no misprint, as the enrolled act, upon -examination, corresponds precisely with the printed enact *503 ment, and if convinced of its impolicy, the adoption of a substitute, which creates a new and substantive prohibition, is not within the legitimate powers of a judicial tribunal. Beside, it is at least questionable, whether the section as thus amended, would not be more impolitic than the section as it now stands. As it is, it leaves the foreign corporation free to loan its own moneys to our citizens, but prohibits it from receiving, any deposits to be used, either here or elsewhere, for its own benefit. The section as it stands, permits, if it does not invite, the introduction of foreign capital, while the amended section would tend to exclude it.
It is claimed, however, that, in the absence of any express statutory prohibition, the discount of the bill by the Bank of Kanawha, within our territorial limits, is opposed to the settled policy of the state, and can not be sustained by our courts. There is perhaps more doubt as to this proposition than attaches to the one we have just considered; but before a contract can be avoided on this ground, the public policy which it violates must be clearly manifest. Especially is this true, where persons, who participated in the alleged illegality, are seeking to avoid the contract for their private benefit.
This “public policy” is sought to be deduced from the present and past legislation of the state in regard to unauthorized banking’and the circulation of 'unauthorized bank paper, connected with some general reflections on the importance of fostering domestic corporations, - who are amenable to the laws of the state and subject to its taxation. •
In Corwin v. The Uriana & Champaign Mut. Ins. Company, 14 Ohio 6-10, which was a proceeding in quo warranto for an alleged usurpation of banking powers, the court having held that the receiving of deposits and the discounting of notes, although a part of the business of banks, is no exclusive privilege of theirs, but a lawful pursuit, in which other corporations or individuals might engage without an usurpation of banking powers, alludes to the object and purposes of the various statutes to prohibit unauthorized banking, etc., as intended to prevent the issuing of notes for circulation as *504 money by other than incorporated banks, says, “ it is against the issue and circulation of notes as currency, that our penal statutes have, without exception, it is believed, been directed from 1816 to the present day.” This decision was pronounced in 1846, the year after the passage of the act cited and relied on by the counsel for the defendants, and is here referred to, not as being precisely accurate, but as a much more reliable exponent of the general object and policy of the various statutes prohibiting the exercise of banking powers.
These statutes then, were not intended to exclude foreign capital, as such, but an unauthorized and irresponsible circulation, and in the section under consideration, to prohibit foreign corporations from using the local deposits for their o-wn benefit.
It would seem somewhat difficult, in this aspect of the legislation, to educe a state policy so clear and mandatory, as to require the forfeiture of a debt, otherwise unobjectionable, for the benefit of one, who, having reaped the advantages, now seeks to evade the obligations it created.
But while the above suggestions tend to prove that the bank might lawfully make and enforce the contract, under the averments and admissions of the first answer I am instructed to place the decision of the demurrer to that answer upon the ground, that the assignee before due and without notice of the' alleged illegality, may recover the amount of the bill from the drawers, even though the bank itself could not have maintained such action; leaving the question, as to the right of the bank to enforce such a contract, open and undecided, until a case requiring its determination may arise.
This proposition assumes, that the discount of the bill was within the prohibition of the statute, and, consequently, that the bill would have hieen invalid in the hands of the bank.
The contract, upon its face, does not appear to be illegal; but is apparently within the corporate powers of the bank; and' the statute does not, expressly, nor by necessary implication, declare that the contract, or the securities thereby acquired, shall be void. The answer, also, impliedly admits, *505 that the bill was assigned to the plaintiff before it was due, and does not charge him with notice of its illegality.
The plaintiff, then, had no notice, either actual or constructive, when the bill was thus assigned to him, that it was made in contravention of the statutes of Ohio, and the case would seem to be fully within the rule, which protects the assignee, before dishonor, of commercial paper, from any illegality in the consideration, not appearing upon • the face of the paper, and of which he was, in fact, ignorant. Story on Bills of Exchange, section 189, and cases there cited.
In Broughton v. The Manchester Water Works, 3 Barn, and Ald. 10, the rule upon this subject is very clearly expressed by Holroyd, J., in a suit by an indorsee against the maker of a note, and in these words: “ I take it to be clear, however, that where a statute prohibits a thing to be done, and does not expressly avoid the securities which fall within the prohibition, there, if the violation of the law does not appear on the face of the instrument, and the party taking it is ignorant that it was made in contravention of the statute, it is an available security in the hands of such person.”
The rule, thus stated, has our unqualified approbation, and is decisive of the first answer. The only objection to the rule, is the abuse to which it may lead, by enabling banks, by a timely transfer of bills thus obtained, to evade a loss ; but the cardinal principle of the commercial law which protects commercial paper, regular upon its face and negotiated before its maturity, can not otherwise be vindicated; and this is of much more importance, than that one who has received the benefits of the paper, or has been instrumental in imposing it upon the public, should be compelled to perform an engagement which he voluntarily made.
The second answer avers that the Bank of Kanawha, through its cashier, received from Prather, one of the defendants, for discount, a paper containing the signatures of all the defendants, but not then filled up, and that the cashi'er, or some other person at his instance, filled up the paper as a bill payable to his order in the city of New York. That none of the defendants were present when it was so filled up, and *506 that no agreement was made, and no directions given, by them or either of them, that it should be made payable in New York. -That said bill, though nominally of the value of $5000, owing to the current rate of exchange, was then worth $5050, and at its maturity would be worth $5150. That it was discounted as of the value of $5000 only, the bank retaining six per cent, interest on that sum for the time it had to run, and paying over the residue of that sum, and no more, to the defendants.
It is somewhat difficult, to' ascertain the character of the defense intended to be made by this answer, and the brief of defendants’ counsel, though quite elaborate as to some of the other answers, is altogether silent as to this. It does not contain the ordinary elements of a plea of usury. No usurious agreement is set forth, and, it would seem, that no agreement was ever made as to the rate of interest to be paid. It is not alleged, even, that illegal interest was exacted or retained, and for aught that appears, the excess may have been ignorantly or innocently withheld. The defense shadowed forth, would rather seem to be, that a fraud had been practiced upon the defendants by the cashier, to whom their signatures, in blank, had been entrusted for one purpose, and used for-another. There is no direct averment of either usury or fraud, and it is at most, purely argumentative, and is so essentially defective that it can not be sustained on either ground.
The third answer charges, in substance, that the place of payment was inserted in the bill by the cashier, as a mere device, tc secure to the bank a greater profit than could be-realized, if the bill had been made payable at the place where discounted, well knowing, and having good reason to believe, when he so discounted the bill for the bank, that the parties thereto would not be prepared, and did not intend, to pay the same at the place of payment therein named. Whereby he secured to the bank, in excess of lawful interest thereon, the' premium of exchange, equal to three per cent, at the maturity of the bill, and then concludes, “ Wherefore said bill is usurious and void by the laws of Ohio, where the contract *507 was made, and of Virginia, where said bank was located, and transacted its ordinary business.”
This answer is predicated on section 5 of the act of March 9, 1850, “to restrain banks from taking usury” (1 S. & 0. Stat. 150), upon the assumption that it is applicable to banking corporations of other states, when discounting commercial paper within our limits. The section reads as follows:
“ Sec 5. The discount or purchase by any banking institution in this state, of any note or bill of exchange on time, payable at a place without the state when the officer or agent of such bank knows or has reason to believe that the parties to such paper will not be prepared, or do not intend to pay the same at the place of payment, or when any device is resorted to in order to secure to said bank a greater profit than it could realize from the discount or purchase of such paper, if made payable at its own counter, shall be deemed and held usurious and unlawful within the meaning of this act.” The first question, and one of much difficulty, is, whether the section above quoted, is applicable to a foreign bank, while “ engaged, in this state, in loaning money upon bills of exchange and other commercial paper ?”
It is very clear that a state may prohibit, altogethér, the banking institutions of other states from exercising corporate powers within its territorial limits, and this right to exclude, necessarily involves the power to specify the terms and conditions upon which such privilege may be exercised. And so long as no other or more onerous restrictions are placed upon the foreign corporation, than are imposed on the domestic institutions of such state, of a like character, there can be no just cause of complaint. Justice and sound policy, however,' would seem to require, that no other or greater privileges and immunities should be accorded to such corporations, than are granted, in similar cases, to the domestic institutions of the state permitting such discount.
Upon this principle it is claimed, that the act of 1850, above referred to, or at least the third, fourth and fifth sections of the act, which undertake to regulate and restrict the discount, by banks, of bills of exchange, etc., tó prevent usu *508 rious exactions thereon, are applicable to all banks, whether foreign or domestic, in discounting such paper within our territorial limits.
The first and second sections, in terms and in subject matter, relate exclusively to banks created under the act of 1845, and if we should hold, that the other sections are, in terms, applicable to foreign, as well as domestic institutions, when acting within the limits of this state, those sections would be a legislative recognition of their right to exercise the functions of banks in Ohio ; and this could scarcely have been the intention of the law-making power.
The title of the act — u an act to restrain banks from taking usury ” — is not, it is true, necessarily confined to banks incorporated by this state, and the departure in phraseology in the last three sections, from “banking institutions of this state” to “banking institutions in this state” might, perhaps, without doing much violence to the language, render those sections applicable to foreign as well as domestic institutions.
It is, however, questionable whether, taking the whole act together, we can hold that any part of it was intended to apply to foreign corporations, exercising corporate powers within this state, or that we, upon a supposed principle of state policy, can apply its provisions to such institutions, especially when the avowed object of such application is to create a forfeiture, or to impose a penalty.
But while doubts may well be entertained as to both these propositions, we deem it unnecessary now to settle them, as we are satisfied that the demurrer to the third answer must be sustained, even if the 5th section of the act of 1850 is held to apply to the Bank of Kanawha, under the facts therein stated; and we, therefore, leave the questions, just considered, to be settled hereafter, should it become necessary.
Sections 8 and 16 of the statutes of Virginia, as to “banks of circulation ” (Revised Code of Virginia of 1849, pages 303, 304), which is made part of the charter of the Bank of Kanawha, among other things, authorize all such banks “ to buy, sell, draw, or negotiate bills of exchange,” etc., and also to *509 discount all such paper, and the provision as to interest on. loans and discounts, is in these words : “ A bank may take interest on its loans and discounts, at the rate of one half of one per centum, for thirty days, and the interest may be received in advance.”
The Bank of Kanawha had, therefore, the power and capacity, by its charter, to acquire the bill by way of purchase or of a loan and discount, and the further right, to sell and negotiate the same when so acquired; and this would have been the case, also, as to a bank of circulation in Ohio.
The bill being negotiable, and in the possession of the bank, was assigned to' the plaintiff before it became due. There was nothing upon its face to show that it had been acquired by the bank in violation of public policy, or of any statutory prohibition ; and the answer does not aver that-the plaintiff had any actual notice' of such illegality when he acquired the bill.
It was, therefore, commercial paper, and, as such, on established principles of commercial faith, as imperative as any other rule of public policy, protected, in the hands of one receiving it in good faith, and before maturity, from any illegality in its consideration, of which he was ignorant. Chitty on Bills, 12th ed., marg. p. 95, top p. 116; Story on Bills, sec. 189.
The only exception to this rule, is said to be, “ where the statute creating the prohibition, has, at the same time, either expressly, or by necessary implication, made the instrument absolutely void in the hands of every holder. And that there are few cases in which a statute has created a positive nullity of such instruments, either in England or America. The most important seems to be the statutes against gaming, and the statutes against usury,” and the rule even in these two cases, has been much modified in England. Story on Bills, sec. 189.
It is not enough that a statute prohibits the act or contract. or declares it illegal. Ib.; see also Allen v. Deming, 14 N. H. 133; Wyatt v. Balmer, 2 Esp. 538; Willmarth v. Crawford, 10 Wend. 343; Adams v. Wooldridge, 3 Scam. 255; *510 Greenland v. Dyer, 2 Man. & Ry. 315; Begbie v. Levi, 1 Cromp. & Jero. (Ex.) 180.
The impolicy of the above exceptions to the rule, arising; out of the statutory enactments against usury and gaming, was so universally felt and acknowledged in England, that the act of 5 and 6 William IY, cap. 41, was passed to remedy it, and the manner of effecting the change is an apt illustration of the difference, in legal effect, between a statute declaring a contract void, and one declaring it unlawful. The act recites, that “ whereas securities and instruments made void by virtue of” (certain acts against usury and gaming, etc., therein specifically named), “ are sometimes indorsed, transferred, assigned, conveyed to purchasers or other persons for a valuable consideration, without notice of the original consideration for which such securities or instruments were given; and the avoidan.ce of such securities or instruments in the hands of such purchasers or other persons, is often attended with great hardship and injustice ;” and then enacts, “ That so much of the hereinbefore recited acts * * * as enact that any note, bill or mortgage shall be absolutely void, shall be, and the same is hereby repealed; but nevertheless, every note, bill or mortgage, which, if this act had not been passed, would, by virtue of the said several last hereinbefore mentioned acts, or any of them, have been absolutely void, shall be deemed and taken to have been made, drawn, accepted, given or- executed for any illegal consideration, and the said several acts shall have the same force and effect which they would respectively have had, if, instead of enacting that any such note, bill or mortgage should be absolutely void, such acts had, respectively provided that every such note, bill, or mortgage should be deemed and taken to have been made, drawn, accepted, given or executed for any illegal consideration.”
In Chitty on Bills, above referred to, the learned author, speaking of this statute and its effect upon securities previously adjudged void in the hands of bona fide indorsees, remarks on page 116, “ we have seen that now, by the 5 and 6 William IY, c. 41, a bill or note, given for an usurious or gaming considera *511 tion, or for signing a bankrupt’s certificate, or for the ransom of a ship, will be valid in the hands of a bona fide holder for value.”
Section 5 of the act of 1850, does not expressly avoid the securities received by the bank under the circumstances therein stated, but merely declares that the discount and purchase of the bill “ shall be deemed and held usurious and unlawful within the meaning of this act.”
We have no statute against usury, as such, declaring the usurious agreement and the securities taken, to be utterly void. The words iC usury” and “usurious” do not occur in any other part of the statute, to which reference might be made, to give to the word any peculiar meaning or effect, and we must, therefore, presume, that the word was used in its ordinary and popular signification, as indicating the reserva tion of illegal interest. The statute then simply declares such purchase or discount unlawful, and all the authorities agree that in such case the bill of exchange would be a valid security in the hands of an indorsee before maturity and without notice of the illegality. Story on Bills, sec. 189. This also accords with the proviso of the act of February 18, 1848, which protects bona fide indorsees of commercial paper, upon which illegal interest was exacted or reserved, and seems to indicate a state policy as to that class of persons, in conformity to the settled rules of the commercial law.
That this state policy as to bona fide indorsees was not changed by the subsequent act of 1850, is plainly inferable from the fact, that it does not expressly avoid the notes or securities taken by the bank.
It is claimed, however, that an incorporated bank can do no act not authorized by its charter, and this, in a certain sense, is true, not only of banks, but of all other private corporations. Its charter is the law of its existence — the source and the limit of its capacity. But it does not follow from this, that a contract made by or with such corporation, and apparently within the scope of its corporate powers, can be avoided in the hands of an assignee before maturity and without notice actual or constructive of its illegality, merely *512 ■because it was iu fact made for a purpose or in a manner not warranted by its charter.
The cases of Stoney v. The Am. Life Ins. Co., 11 Paige 635; Willmarth v. Crawford, 10 Wend. 341; McIntire v. Preston, 5 Gilman, 48; Broughton et al. v. Manchester Water Works, 3 Barn. & Ald. 10; City Bank v. Macy, 1 Hall, S. C. 70; White et al. v. How et al., 3 McLean, 91, and Ohio Life Ins. & Trust Co. v. Merchants’ Ins. Co., 2 Hump. 1, were all cases of private corporations, invested with a general power -to make contracts of the description in suit in the several .cases, but restricted from making the particular agreement, at the time, in the manner, or for the purposes, for which it was in fact made; and in all which cases it was held, that such contract, if regular upon its face and assigned before it was due to a third person, without notice actual or constructive of its illegality, would be a valid agreement in the hands of suoh ■assignee, and might be enforced.
At the close of section 268 of Angelí & Ames on Corporations, the learned authors remark : “ The rule seems to be, that if the corporation have the power to make or take a note for any purpose, a note originally given by or to them would be valid in the hands of a bona fide holder, or their bona fide indorsee without notice, though the corporation might not have had the power to make or take that particular note.”
The rule as deduced from these authorities seems to be this: If there was an utter want of power in the corporation to make such a contract, as the agreement upon its face purports to be, it is of no validity either in the hands of the corporation or of its assignee; the bank knew and the assignee must be presumed to know the law, and as it appears upon the face of the contract, that it is not warranted by the charter, the assignee can not be said to have taken it in good faith and without notice of its invalidity. But if a negotiable security, given to or made by a corporation, appears upon its face to be such as the corporation might make or receive under its charter, and the assignee receives it before due and without notice, actual or constructive, of its real invalidity, it is an available .security in his hands.
*513 Here the cause of its invalidity is not an utter want of power on the part o'f the corporation, but a mere abuse of the-powers conferred upon it, and of which the assignee was ignorant ; and the assignee in such case, for the reasons before-adverted to, is, and-ought to be, protected from a secret defect of which he had no knowledge.
This is also in accordance with the opinion expressed by Lord St. Leonards, as to the proper rule as between the parties to the contract, in Eastern Counties Railway v. Hawkes, 35 Eng. L. & Eq., on page 32, that “ the doctrine of ultravires, should be restrained to clear cases of excess of power, with the knowledge of the other party, express or implied from the nature of the corporation and of the contract entered into.”
Most of the cases in which the question as to the validity of such contracts has been considered, were suits between the original parties to the illegal agreement, and in which no recovery could, for that reason, have been had by either party. And the difficulty which now surrounds the question, is mainly attributable to the language of the court, in disposing of those cases — that the contract is “ void ” or is “ utterly void,” etc. A judicial decision that a contract is void, means merely that it is void as between the parties to that suit and not- that it is void in the sense of the statute of Anne against usury; which declares that “ all bonds, contracts, etc., made for the payment' of the loan, shall be utterly void.” The statute operates directly upon the agreement itself, and annuls it altogethei; while the decision only bars a recovery in that suit.
It is the province of a court to apply the law to the facts-of the case before it, and when a contract, voidable in its nature, or- as to particular persons, is before such court, under circumstances rendering it inoperative in that suit, the-court, very naturally pronounces the contract void and oftentimes without annexing any qualification. The cases in Ohio, to which we have been referred, were all of this character. The suits were in behalf of the original parties to the contract, violating a statutory prohibition, and no rule is better-settled than this, that the original parties to an illegal contract can maintain no action to enforce it; but the cases here *514 inbefore cited, establish, we think conclusively, that upon principle and authority, there being no statute that expressly annuls the contract, negotiable in form, and assigned before maturity to one having no notice, actual or constructive, of such illegality, such agreement, though voidable between the original, parties, becomes an available security in the hands of such assignee.
The Ohio cases were, we think, rightly determined; but the language used by the court in those cases was not, perhaps, as guarded as it should have been; and we are also fully persuaded that the' court would have come to a different result if the suits had been brought by such bona fide assignee, instead of a party to the illegality. If it is urged that the sureties were ignorant of the illegality, and should, therefore, be relieved, we reply in the words of Chief Justice Savage, in 6 Wend. 620, where a note fraudulently put in circulation had come into the hands of a bona fide holder — “ with the exception of those cases in which the statute has declared the notes void, it may be laid down as a broad general principle, that whenever one of two innocent persons must suffer by the act of a third, he who has enabled such third person to occasion the loss must sustain it.”
The fourth answer is based upon the amendatory act of 1846 (1 S. & C. Stat. 863), in relation to damages upon protested Bills of exchange, and seeks to avoid the obligation to pay the damages demanded in the petition, by the averment, that at the time the bill of exchange was discounted by the bank, it was not intended by the cashier of the bank and Prather, the parties negotiating said discount, that the bill should be paid by Ludlow, upon whom it was drawn. No argument has been presented to us, in regard to the demurrer to this answer by either party.
The bill, under the averments of the petition, entitled the plaintiff prima facie to recover the statutory damages allowed by the laws then in force, and there is no averment in the answer, that the plaintiff had any notice, actual or constructive, of this secret understanding or agreement, between the bank and the drawers of the bill, at the time it was thus as *515 ■signed to him, and we think the answer, without such averment, is fatally defective.
The demurrer is, therefore, sustained to all of the answers ■filed by the defendants, and the cause remanded to the district court for further proceedings.
Sutliee, O.J., and Gholson and Scott, J J., concurred.
Brinkerhoee, J., dissented as to the first and second propositions of the syllabus.